IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| WELK-KO FABRICATORS, INC., TYLER SALES, INC. d/b/a NORTHERN METALS, INC., QUICKSILVER WELDING SERVICES, INC., LEXINGTON HOMES, INC., and BREEZIN METAL WORKS, INC., individually, and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) ) ) |
| | |
| *Plaintiffs*, | ) |
| v. | ) ) |
| GOLDMAN SACHS GROUP, INC., GS POWER HOLDINGS LLC, METRO INTERNATIONAL TRADE SERVICES LLC, LONDON METAL EXCHANGE LIMITED, and JOHN DOES 1-20, jointly and severally, | ) ) ) ) ) ) ) |
| | |
| *Defendants*. | |

Hon.

Civil Action No.

**JURY TRIAL DEMANDED**

**CLASS ACTION COMPLAINT**

**Possible companion cases:**

**2:13-cv-13413-DML-RSW;
2:13-cv-13418-PDB-MAR;
2:13-cv-13315-PDB-MAR;
2:13-cv-13555-PDB-MAR; and,
2:13-cv-13701-PDB-RSW**[1]

---

## Class Action Complaint

Plaintiffs Welk-ko Fabricators, Inc., Tyler Sales, Inc. d/b/a Northern Metals,

Inc., Quicksilver Welding Services, Inc., Lexington Homes, Inc., and Breezin

Metal Works, Inc. ("Plaintiffs") bring this class action for injunctive relief under

---

[1] There appear to be other possible companion cases outside the Eastern District of Michigan, including Master Screens Inc., *et al*, v. Goldman Sachs Group Inc., *et al*, 4:13-cv-00431, N.D. Fla., and River Parish Contractors Inc. v. Goldman Sachs Group Inc., *et al*, 2:13-cv-05267, E.D. La. In the latter case, a motion for Transfer and Centralization to the Eastern District of Michigan was filed on August 12, 2013.

Section 16 of the Clayton Act (15 U.S.C. §26) and as indirect purchasers individually and on behalf of all others who indirectly purchased products containing aluminum in the States of  Arizona, Arkansas, California, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin, and the District of Columbia (the "Class Jurisdictions"), against Defendants Goldman Sachs Group, Inc. ("Goldman") GS Power Holdings LLC ("GSPH"), Metro International Trade Services LLC ("Metro"), the London Metal Exchange Limited ("LME"), LME Holdings Limited, and John Does 1-20 (collectively "Defendants").   The allegations herein are based on personal knowledge as to Plaintiffs' own conduct and aluminum purchases and are made upon information and belief as to all other matters based on investigation by counsel.[2]

## I.   INTRODUCTION

1.     Plaintiffs allege that from February 1, 2010, forward (the "Class Period"), Defendants exercised their market power, and combined, conspired, and

---

[2] Counsel's investigation includes an analysis of aluminum pricing and storage rate information, news articles, statements made during Congressional hearings related to investigation of manipulation in the market for aluminum, and additional analysis of related issues and information.

agreed to artificially limit and restrain the availability of aluminum supplies in the United States.

2.      Plaintiffs allege that Defendants combined, conspired and agreed with one another to artificially limit and restrain the availability of aluminum supplies for improper reasons, such as earning excessive storage fees and benefiting Goldman trading positions.

3.      Plaintiffs allege that Defendants' agreements constitute violations of antitrust laws, as abusive monopolization and as unreasonable agreements, arrangements, conspiracies, or combinations in restraint of trade.  As detailed herein, Defendants' agreements were designed to and did directly fix, maintain, and inflate the prices of aluminum in the Class Jurisdictions during the Class Period.

4.      Plaintiffs allege that Defendants' actions during the Class Period violated antitrust laws in the Class Jurisdictions.

5.      Plaintiffs allege that Defendants' actions during the Class Period violated unfair or deceptive practices laws in the Class Jurisdictions.

6.      As detailed herein Defendants' agreements were designed to and did directly fix, maintain, and inflate the prices of aluminum in the Class Jurisdictions during the Class Period.  As alleged by Plaintiffs herein, the Defendants' agreements described herein constitute violations of Section 1 of the Sherman Act, 15 U.S.C. §1, and state antitrust and unfair competition laws as unreasonable agreements, conspiracies or combinations in restraint of trade.  As detailed herein, Defendants' agreements were designed to and did directly fix, maintain and

unreasonably inflate the prices of aluminum in the United States during the Class Period.

7.     As alleged by Plaintiffs herein, the Defendants have each engaged in anti-competitive activity and abused their respective monopoly powers in violation of Section 2 of the Sherman Act, 15 U.S.C. §2, and state antitrust and unfair competition laws.  They have also acted, and conspired, to attain and exercise such monopoly power to their economic gain and to the injury of purchasers such as Plaintiffs, in violation of Section 2 and state antitrust and unfair competition laws.

8.     As alleged by Plaintiffs herein, the Defendants have been unjustly enriched by their wrongful conduct through, *inter alia*, receipt of inflated profits from the Defendants' manipulation of the price of aluminum.

9.     **Damages:**  As a result of Defendants' actions, Plaintiffs have suffered damages compensable by state antitrust and unfair competition laws and Plaintiffs and the members of the classes they seek to represent have sustained significant damage and injury.

10.     Defendants have injured purchasers of aluminum, such as Plaintiffs and members of the Class, who purchased aluminum in the United States at inflated prices by unlawfully restraining supplies of aluminum and causing prices to rise to supra-competitive levels.  Defendants unlawfully restricted aluminum supplies by, *inter alia*, diverting aluminum from productive uses into warehouses controlled by the Defendants and then engaging in anticompetitive conduct to artificially restrict the amount of aluminum supply leaving Defendants' warehouses and entering the market.  The scheme inflated daily storage fees at aluminum warehouse facilities, many of which were owned or controlled by

Defendants, which affected aluminum market prices, allowing Defendants to profit from trading positions tied to aluminum prices. As a direct result of Defendants' violations, Defendants have artificially inflated the price of aluminum and have reaped substantial profits from their anticompetitive conduct. Defendants' conduct proximately and foreseeably caused Plaintiffs and members of the Class to suffer injuries by forcing Plaintiffs and the Class to pay artificially inflated prices for aluminum throughout the Class Period.

11.    During the Class Period, Defendants held the sensitive position of controlling both (a) exchange-traded aluminum forward or futures contracts in the U.S., and (b) warehousing of exchange-traded aluminum in the U.S., including in the Midwest and the greater Detroit, Michigan area.

12.    The LME held a monopoly over the trading of aluminum forward or futures contracts in the United States during the Class Period, included capturing approximately 97-99% of the trading in such contracts.

13.    The LME also approves and certifies warehouses for the delivery of aluminum, and other metals contracts.

14.    At the start of the Class Period, Goldman purchased Metro, one of the largest storers of aluminum in the United States, with warehouses representing more than 80% of the LME-certified storage space for aluminum in the Detroit area. More than a quarter of the supply of available aluminum in the United States is kept in Metro's warehouses.[3]

---

[3] David Kocieniewski, <u>A Shuffle of Aluminum, but to Banks, Pure Gold</u>, N.Y. Times, July 20, 2013, at A1 ("July 20 N.Y. TIMES REPORT").

15.     Among the prices manipulated by the Defendants' conduct is the "Midwest Premium," which is the benchmark used for most physical buying and selling of aluminum in North America.[4]   The Midwest Premium has more than doubled during the Class Period, rising from $0.055/lb just prior to the beginning of the Class Period (in January 2010) to over $0.118/lb by July 2013.

16.     As explained by THE NEW YORK TIMES in a July 20, 2013, article describing details of the Defendants' misconduct and the impact of the misconduct on the United States' aluminum market, "[h]undreds of millions of times a day, thirsty Americans open a can of soda, beer or juice.  And every time they do it, they pay a fraction of a penny more because of a shrewd maneuver by Goldman Sachs and other financial players that ultimately costs consumers billions of dollars." July 20 N.Y. TIMES REPORT.

## II.     SUMMARY OF ALLEGATIONS

17.     The Defendants acted or conspired to artificially restrict the supply of aluminum in the United States throughout the Class Period.

18.     The LME establishes rules for the warehousing of exchange traded aluminum in the U.S., including the minimum withdrawals of metals required by LME approved warehouses, whether to allow minimum withdrawals to be implemented as maximum output rates without penalty, and storage fees.

---

[4] The "Midwest Premium" is also sometimes referred to as the Platts MW Midwest Premium or the Midwest Transaction Premium price and is the benchmark used for most physical buying and selling of aluminum in North America. *See* Chris Kelly, U.S. Aluminum Premiums Soar to Record Above 10 cts/lb, Reuters (May 8, 2012 11:30 AM) http://www.reuters.com/ article/2012/05/08/aluminum-physical-idUSL1E8G3NC120120508.

19.     The rules for LME-regulated warehouses, such as those operated by Metro, were influenced by interested parties, such as Goldman and Metro. Goldman sat on LME's Executive Committee which was responsible for, *inter alia*, making warehousing related policy recommendations to the LME.  Metro sat on the LME Warehouse Committee.

20.     The LME benefits from fees charged by warehouses by taking approximately 1% of warehousing fees.[5]   According to the July 20 N.Y. TIMES REPORT, the warehouses typically charge $0.48 per ton of aluminum per day stored.

21.     As part of the scheme to restrict the supply of aluminum, it is believed Defendants have also offered discounts on storage rates in exchange for guarantees not to move metal from the warehouse as well as incentive payments for long-term storage contracts.[6]

22.     Goldman purchased Metro in February of 2010.   Goldman's acquisition of Metro not only gave the Goldman Defendants an income stream from guaranteed storage fees, estimated by THE NEW YORK TIMES to be a "quarter-billion dollars a year," but it also provided Goldman with a platform to improperly and artificially influence commodities prices to the  benefit of Goldman trading positions.

---

[5] *See* London Metals Exchange, http://www.lme.com/trading/fees/warehouse.

[6] Dustin Walsh, <u>Aluminum uncoils: Feds investigate claim of warehousing metal to artificially raise prices</u>, CRAIN'S DETROIT BUSINESS, (August 18, 2013 8:00 AM) http://www.crainsdetroit.com/article/20130818/NEWS/308189986/aluminum-uncoils-feds-investigate-claim-of-warehousing-metal-to ("CRAIN'S Article").

23.     As alleged herein, the Defendants acted or conspired to use their dominance over the aluminum warehouse market in the United States to artificially delay the removal of aluminum from Metro's warehouses and to otherwise increase the amount of aluminum stored in Metro warehouses by shifting aluminum from one warehouse to another.  The increase in stored aluminum leads to increased revenue from storage fees for the Defendants, artificially creates a shortage in key U.S. sub-markets, and drives aluminum prices higher for Plaintiffs and others.

24.     The increase in the amount of stored aluminum simultaneously increases the Midwest Premium price, which is a fee buyers pay for metal that is dictated by the warehouse system and includes costs of storing.[7]  As reported in CRAIN'S DETROIT BUSINESS, Midwest Premium prices have risen to as much as $250 per metric ton from $150 per metric ton in 2011.[8]  The backlog of stored aluminum further constricts the supply of aluminum in the United States, increasing prices relative to an efficient market and benefiting Goldman trading positions.

25.     The Defendants' manipulation of premium prices is apparent, as one analyst put it, "[b]ecause of the unprecedented and increasing cost of sourcing out metal in Detroit . . . given the emergence of a record queue in a context of a critical

---

[7] *Id.*

[8] *Id.*

8

mass of metal concentrated in one warehousing company in one location with what clearly seems to be an inorganic loud-out rate."[9]

26.    The Defendants' scheme was executed on several fronts.  First, Goldman provided financial incentives to aluminum producers and traders to store aluminum in Metro.  The incentives led to Defendants amassing a huge stockpile of aluminum, increasing the aluminum in their warehouses from approximately 850,000 tons to over 1.5 million tons during the Class Period.[10]  These cash incentives also created an artificial "floor" under the Midwest Premium, because the Midwest Premium must be high enough to overcome the cash incentive to entice metal away from the warehouse and back into the market.[11]

27.    Second, the Defendants created artificial delays in retrieving aluminum from storage which lengthened storage times and increased the accompanying storage fees paid to Goldman (and through Goldman to the LME).  Specifically, LME had put in place requirements, purportedly to protect buyers, that warehouses must deliver a certain amount of metal every day.  However, by agreeing that minimum customer delivery requirements could be interpreted as maximums without penalty, the Defendants proceeded to consistently slow deliveries to an artificially limited and bare minimum.

---

[9] *Id.*

[10] *See* July 20 N.Y. TIMES REPORT.

[11] *See*, Mike Southwood, CRU, US Midwest Premiums – The Method Behind the Madness, The (February 21, 2013), http://www.crugroup.com/about-cru/cruinsight/US_midwest_premiums ("CRU Article").

28.    In addition to treating the minimums as maximums, Defendants also agreed that the total shipments required could be "netted," which in effect allows the warehouse operators to count a shipment from one warehouse to another warehouse owned by the same operator against the daily LME minimum output requirement.  The agreement created a bizarre scenario, described by one forklift operator quoted by THE NEW YORK TIMES, as a "merry-go-round of metal," moving between Metro warehouses in the Detroit area while customers' delivery times for withdrawing aluminum increased about tenfold, from six weeks waiting time before Goldman purchased Metro to 16 months of waiting for delivery.

29.    According to THE NEW YORK TIMES, "industry analysts estimate that 90 percent or more of the metal moved at Metro each day goes to another warehouse to play the same game" and this number has apparently been confirmed off the record by current and former Metro employees.[12]

30.    The shuffling of aluminum from one warehouse to another is further evidenced by the sharp increase in cancelled warrants during the Class Period.  A warrant is the document of title to aluminum stored in an LME certified warehouse.  Each warrant represents a specific physical lot; a specific non-interchangeable tonnage and brand.  The LME maintains an electronic records system of warrants.  When metal is moved from a warehouse, the warrant on the metals exchange must be cancelled.  In 2011, "cancelled warrants rose from 30,000t to 300,000t in a matter of months."[13]

---

[12] *See* July 20  N.Y. TIMES REPORT.

[13] *See* CRU Article.

10

31.   As reported by CRAIN'S DETROIT BUSINESS, "[o]f the 1.46 million metric tons of aluminum at Metro International's Detroit warehouses, 916,425 metric tons were on canceled warrants, as of [August 15, 2013]."[14]

32.   The constrained supply artificially increased, *inter alia*, the Midwest Premium, and forced class members to purchase aluminum at artificially inflated prices.  For example, the Midwest Premium has doubled during the Class Period, rising from $0.055/lb just prior to the beginning of the Class Period (in January 2010) to $0.115/lb as of January 2013,[15] and continued upward through the first half of 2013.  According to a July 20 New YORK TIMES reporting of analysis from industry executives, analysts, and consultants, "the efforts by Goldman and other financial players has cost American consumers more than $5 billion over the last three years."

33.   As the chart below illustrates (with bars representing inventory and the line representing Midwest Premium), there is no denying the correlation between increased aluminum storage rates and the steadily increasing Midwest Premium:

---

[14] *See* CRAIN'S Article.

[15] *See* CRU Article.

11



34.   The artificially inflated Premiums are passed on to U.S. purchasers of aluminum, such as Plaintiffs and members of the Class.  Plaintiffs hereby seek redress for Defendants' illegal conduct that has caused damage to Plaintiffs and members of the class.

### III.   JURISDICTION AND VENUE

35.    Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against Defendants for violation of Section 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2) and antitrust laws.   Plaintiffs also assert claims for actual and exemplary damages pursuant to state antitrust, unfair competition, and consumer protection laws, and seek to obtain restitution, recover damages, and secure other relief against Defendants for violation of those state laws. Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

36.    This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2), and Title 28, United States Code, Sections 1331 and 1337 and 15 U.S.C. §§7, 15(a), and 26.   This Court has subject-matter jurisdiction over the State law claims in this action pursuant to 28 U.S.C. §§ 1332(d) and 1367, because this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interests and costs, in which some members of the proposed Classes are citizens of different states than some Defendants.

37.    Venue is proper in this district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), and 15 U.S.C. §§1,

2, 7, 15, 22 and 26, because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this district, and one or more of the Defendants reside, are licensed to do business in, are doing business in, has agents in, or are found or transact business in this district. For example, Metro has significant operations in this District. Moreover, a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

## IV. PARTIES

### A. Plaintiffs

38.     Plaintiff Welk-ko Fabricators, Inc. ("Welk-ko") is a Michigan Corporation located at 11885 Mayfield, Livonia, Michigan 48150. Welk-ko specializes in custom sheet metal fabrication using a variety of materials, including aluminum. Welk-ko was damaged in its property and business by purchasing aluminum for use in its business activities at prices artificially and intentionally inflated by the Defendants' conduct throughout the Class Period, as alleged herein. Welk-ko directly suffered antitrust injury by transacting in the relevant market in which Defendants were intentionally inflating prices. Specifically, Welk-ko purchased aluminum pursuant to contracts for "market" price aluminum where the "market" price included or was based-on, at least in part, the Midwest Premium.

39.     Plaintiff Tyler Sales, Inc. d/b/a Northern Metals, Inc. ("Northern Metals") is a Michigan Corporation located at 1600 East 11 Mile Road, Madison Heights, Michigan 48071. Northern Metals was damaged in its property and business by purchasing aluminum for use in its business activities at prices

14

artificially and intentionally inflated by the Defendants' conduct throughout the Class Period, as alleged herein.  Northern Metals directly suffered antitrust injury by transacting in the relevant market in which Defendants were intentionally inflating prices.  Specifically, Northern Metals purchased aluminum pursuant to contracts for "market" price aluminum where the "market" price included or was based-on, at least in part, the Midwest Premium.

40.    Plaintiff Quicksilver Welding Services, Inc. ("Quicksilver") is a Florida Corporation with its principal place of business at 124 Industrial Court, Freeport, Florida 32439.  Quicksilver was damaged in its property and business by purchasing aluminum for use in its business activities at prices artificially and intentionally inflated by the Defendants' conduct throughout the Class Period, as alleged herein.  Quicksilver has directly suffered antitrust injury by transacting in the relevant market in which Defendants were intentionally inflating prices.  Specifically, Quicksilver purchased aluminum pursuant to contracts for "market" price aluminum where the "market" price included or was based-on, at least in part, the Midwest Premium.

41.    Plaintiff Lexington Homes, Inc. ("Lexington") is a Mississippi Corporation with its principal place of business located at Highway 12 East, Lexington, MS 39095.  Lexington is a builder of HUD Code Manufactured Housing.  Lexington was damaged in its property and business by purchasing aluminum for use in its business activities at prices artificially and intentionally inflated by the Defendants' conduct throughout the Class Period, as alleged herein.  Lexington has directly suffered antitrust injury by transacting in the relevant

15

market in which Defendants were intentionally inflating prices. Specifically, Lexington purchased aluminum sheets for use in its manufactured housing.

42. Plaintiff Breezin Metal Works, Inc., ("Breezin") is a Tennessee Corporation with its principal place of business at 15425 Dayton Pike, Sale Creek, Tennessee 37373. Breezin fabricates custom built railing systems, fencing, and gates using a variety of metals, including aluminum in its business activities. Breezin was damaged in its property and business by purchasing aluminum for use in its manufacturing activities at prices artificially and intentionally inflated by the Defendants' conduct throughout the Class Period, as alleged herein. Breezin has directly suffered antitrust injury by transacting in the relevant market in which Defendants were intentionally inflating prices. Specifically, Breezin purchased aluminum sheets for use in its fabricating operations.

**B.     Defendants**

43. Defendant Goldman is one of the largest investment banking, securities and investment management firms in the world, providing a vast array of financial services. Goldman is located at 200 West Street, New York, New York 10282. Before and during the Class Period, Goldman has traded extensively in commodities on the LME, including aluminum trades, and was a shareholder of LME holdings.

44. Defendant GSPH is a subsidiary of Goldman and is the immediate parent of Metro. GSPH is located at 85 Broad Street, New York, New York 10004.

45. Defendant Metro is a LME-certified warehouse operator, specializing in the storage of metals, including aluminum, for the London Metal Exchange.

16

Metro was acquired by Goldman in February 2010 and operates as a subsidiary of GSPH. As of March 8, 2013, Metro operated 29 out of a total of 37 LME-listed storage facilities in the Detroit metropolitan area. Metro is located at 6850 Middlebelt Road, Romulus, Michigan 48174. Metro's Michigan facilities house approximately one quarter of the aluminum stored in LME facilities globally and over 70% of the available aluminum in North America.[16]

46.    Defendant LME is the world center for the trading of industrial metals and more than 80% of all non-ferrous metals futures business is transacted on the LME's trading platforms. The LME participants include buyers and sellers from the physical industry. The LME is located at 56 Leadenhall Street, London EC3A 2DX, United Kingdom and does business in the United States and in this District by, among other things, promoting its exchange among U.S. market participants including through business meetings and also through the warehousing activities alleged herein, and licensing of warehouses in the U.S. According to the LME's website, "[the LME] is the world centre for industrial metals trading and price-risk management. More than 80% of global non-ferrous business is conducted here and the prices discovered on our three trading platforms are used as the global benchmark."[17]    The LME created Goldman's power and acquiesced in its monopolistic exercise.

---

[16] *Examining Financial Holding Companies: Should Banks Control Power Plants, Warehouses, and Oil Refineries?*, Senate Committee on Banking, Housing, and Urban Affairs Subcommittee on Financial Institutions and Consumer Protection, July 23, 2013 (Statement of Timothy Weiner, Global Risk Manager, MillerCoors LLC), at pp. 15-17, http://www.banking.senate.gov/public/index.cfm?FuseAction= Hearings.Hearing&Hearing_ID=cca72cb5-a8fd-427a-978a-a51140a75cb0 ("Weiner Senate Testimony").

[17] *See* London Metal Exchange, http://www.lme.com/.

47.    Defendant LME Holdings Limited is a corporation that, until December 6, 2012, owned the LME.  On December 6, 2012, the LME was acquired by the Hong Kong Exchanges & Clearing.  Until LME Holdings' sale, Goldman was its second largest shareholder, holding approximately 1.23 million shares (nearly 10% of all shares).  The largest shareholder, JP Morgan, held approximately 1.4 million ordinary shares (approximately 11% of all shares).[18]

48.    John Doe Defendants 1-20 are other persons who have engaged in the agreements alleged herein, including warehouse owners situated similarly to Goldman and Metro.

## V.    SUBSTANTIVE ALLEGATIONS

**A.    Goldman and LME had the ability and motive to conspire and to enter agreements in unreasonable restraint of trade.**

49.    In late 2008 and 2009, domestic aluminum storage increased as manufacturing activity slowed following a downturn in the U.S. economy.  The buildup of aluminum gave owners of LME approved warehouses an opportunity to increase revenues from rents associated with housing aluminum.  Additionally, since the LME receives 1% of fees earned by LME approved warehouses, increases in revenues from aluminum storage directly benefitted the LME.

50.    Goldman purchased Metro in February 2010 for $550 million.  The acquisition not only gave Goldman the ability to control a critical component in the distribution of aluminum in the United States but it also gave Goldman a voice on

---

[18] *See* Douwe Miedema, <u>JP Morgan to buy MF Global stake in LME</u>, REUTERS, (Nov. 22, 2011, 5:45 PM) http://www.reuters.com/article/2011/11/22/us-jpmorgan-lme-idUSTRE7AL1AJ20111122 ("2011 REUTERS Article").

the LME Warehouse Committee, through Metro's seat on that committee.[19]  The LME Warehouse Committee makes recommendations to LME's Executive Board regarding warehousing requirements, including, for example, minimum output requirements.

51.    The LME's Warehouse Committee plays a critical role in setting the rules and regulations that govern their own operations, such as "Assisting . . . with the formation of working groups to advise [the LME's Executive Committee] on warehousing issues (*e.g.* structure of warehouse agreement, location policy, capacity constraints)…[and] [m]aking recommendations to [the LME's Executive Committee] on warehousing related policy issues."[20]

52.    Goldman's acquisition of Metro also gave it business intelligence to benefit its trading activities.

53.    Similarly, in 2010, JP Morgan - another large LME shareholder at the time - acquired Henry Bath, a UK-based metals warehousing company that owns and operates one of the largest LME-approved global metal storage networks including aluminum.[21]

---

[19] *See* London Metal Exchange, http://www.lme.com/about-us/corporate-structure/committees/warehousing-committee/, last visited August 27, 2013.

[20] London Metal Exchange, Warehousing Committee Terms of Reference, http://www.lme.com/~/media/Files/Committees/Committee%20Terms%20of%20Reference/Warehousing%20Committee%20Terms%20of%20Reference.pdf.

[21] *See Examining Financial Holding Companies: Should Banks Control Power Plants, Warehouses, and Oil Refineries?*, Senate Committee on Banking, Housing, and Urban Affairs Subcommittee on Financial Institutions and Consumer Protection, July 23, 2013 (Statement of Saule Omarova, Associate Professor of Law, UNC Chapel Hill School of Law), at p. 17, http://www.banking.senate.gov/public/index.cfm?FuseAction= Hearings.Hearing&Hearing ("Omarova Senate Testimony"); *see also*, Mike Jackson, *Henry Bath & Son: A Company and family*

54.     Like Metro, Henry Bath is represented on the LME's Warehousing Committee, which has significant influence over the rules for the warehousing of exchange traded aluminum in the U.S.  As 100% owner of Henry Bath, JP Morgan, like Goldman with Metro, has both a say in establishing rules for LME-regulated warehouses as well as a significant stake in the outcome and potential to benefit from favorable rules.

55.     As stated on July 23, 2013, in testimony before the Senate Committee on Banking, Housing, and Urban Affairs, Subcommittee on Financial Institutions and Consumer Protection,

> Ownership of the key LME warehouses by large commodity traders with integrated financial and physical metals operations allows them to control the supply of aluminum to commercial users and, as a result, to control prices.  This led market participants to worry about unfair advantage for such firms, as they now can use their knowledge of how much metal is stored, as well as their ability to control delivery of physical metal to consumers, to determine their own trading strategies.[22]

56.     Professor Omarova further testified as follows:

> Goldman is one of the largest traders of derivatives in the metals markets.  Unlike an independent warehouse operator, Goldman can potentially use its storage capabilities not only to generate rental income but also to move commodity prices in a way that would benefit its derivatives positions. . . . As one of the world's biggest dealers in commodity derivatives, Goldman can devise and execute highly sophisticated trading strategies across multiple markets.  The ability to influence prices of physical assets underlying derivatives, in

---

*History*, http://www.henrybath.com/assets/_files/documents/jun_11/ HENRYBATH__1308588481_Complete_Henry_Bath_History.pdf.

[22] Omarova Senate Testimony at pp. 15-16.

effect, completes the circle.  It makes Goldman's derivatives profits not so much a function of its traders' superior skills or executives' talents, but primarily a function of the firm's *structural market power.*[23]

57.    Professor Omarova's testimony continued as follows:

In contrast to securities markets, commodities markets are particularly vulnerable to so-called market power-based manipulation that may not involve fraud or deceptive conduct.  A large trader can significantly move prices of futures and underlying physical commodities not only by 'cornering' the market in a particular product but also by placing very large sell/buy orders in excess of available liquidity.  This salience of market power in commodities market manipulation underscores the potential dangers.[24]

58.    Thus, by the start of the Class Period, Goldman owned one of the largest aluminum warehouses in the United States, was on the rules committee – along with other similarly motivated entities such as JP Morgan - for determining the LME output requirements for its warehouse, would directly benefit from rents charged for delays in releasing aluminum, and had a trading desk that could profit from intelligence gained from Goldman's control of Metro and its position on the LME committees.

**B.    Defendants benefit from storage fees.**

59.    Defendants have received hundreds of millions of dollars annually in storage revenues during the Class Period through artificially high storage rates

---

[23] Omarova Senate Testimony at p. 22 (emphasis in original).

[24] *Id.* at p. 23.

caused by Defendants' intentional and grossly inefficient delays in aluminum delivery and manipulation of warehousing rules to allow for excessively high storage rates.[25]  These revenues constitute an artificial and unreasonable cost that is only possible as a result of monopoly pricing power and abusive agreements in restraint of trade.  As detailed herein, Defendants conspired to preserve their ability to charge excessive fees by increasing aluminum supplies in Goldman's warehouses and thereby artificially restricting the supply of aluminum in the United States.

60.    Goldman bought Metro in 2010, and thereafter Metro began to stockpile aluminum.

61.    After purchasing Metro, Goldman and Metro began to offer financial incentives for aluminum producers to store aluminum in Metro warehouses, which were implemented with the consent, agreement, or acquiescence of the LME, and also to the LME's direct financial benefit.

62.     Goldman and Metro offered incentives to aluminum producers and traders to divert more aluminum into Metro warehouses, to renew aluminum leases, to enter into long-term aluminum storage leases, and to "rewarrant" aluminum.

---

[25] *See* July 20 N.Y. TIMES REPORT.

63.    As a result of these incentives, supplies of aluminum in warehouses owned and controlled by Defendants have increased from approximately 850,000 tons at the start of the Class Period to nearly 1.5 million tons as of July 2013.  As of August 15, 2013, Metro held 1.46 million metric tons of aluminum in its Detroit area warehouses.[26]

64.    These increased aluminum storage rates are driven higher by the Goldman Defendants' unwillingness to increase aluminum output from warehouses.  For example, from January 2011 to June 2011, "Metro warehouses in Detroit took in 364,175 tonnes of aluminum and delivered out 171,350 tonnes. That represented 42 percent of inventory arrivals globally and 26 percent of metal delivered out[.]"[27]

### C.    Defendants agreed that "minimum" means "maximum".

65.    While stockpiles were increasing, the Defendants took additional steps to artificially restrict the supply of aluminum into the market.  Specifically, the Defendants, as members of the LME Warehouse Committee, maintained an agreement with the LME that required a minimum of 1,500 tons (later increased to 3,000) of metal per city to be released each day.

---

[26] *See* The Crain's Article.

[27] Pratima Desai, *et al.*, Goldman's new money machine: warehouses, REUTERS (July 29, 2011 11:28 AM), http://www.reuters.com/article/2011/07/29/us-lme-warehousing-idUSTRE76R3YZ20110729 ("2013 REUTERS Article").

66.    The minimum release requirement purportedly satisfied purchaser demand.  However, implicit in the shipping requirements was an agreement that (i) the "minimum" could readily be treated as a maximum with no penalty, (ii) the "minimum" applied to an entire city (*i.e.*, no percentage-per-warehouse shipment was required) – allowing Goldman to take advantage of the massive concentration of warehouse space in the Detroit metropolitan area to essentially render the shipping requirement meaningless, and (iii) allowed "netting" of incoming shipments which encouraged "shuttling" of shipments between Metro-owned warehouses (*e.g.*, a shipment from one of Goldman's warehouses directly to another would count against the daily quota).

67.    In practice, the Defendants treated the LME minimums as maximums, which was done with the ongoing knowledge, consent, or acquiescence of the LME.  Moreover, the "netting" and "shuttling" of shipments allowed Goldman to shuffle aluminum between its own facilities (thereby facially meeting the LME's minimum release requirements) without actually releasing commodities from warehouse storage into the market.

68.    As a result, Metro warehouse workers have reported that they routinely saw the same truck drivers making three or more round trips each day between Goldman warehouses.[28]    According to a forklift driver who worked at

---

[28] *See* July 20 N.Y. TIMES REPORT.

Metro warehouses, while aluminum was delivered in huge loads by rail car, it left in a relative trickle by truck.[29]

69.    Defendants' shortage-creating strategies artificially delayed and decreased the amount of aluminum entering the market.  According to THE NEW YORK TIMES, from the time Goldman acquired Metro, wait times to withdraw aluminum from Metro have grown from an average of six weeks to more than sixteen months, a ten-fold increase.[30]   The delays occurred notwithstanding Goldman's ability to locate and release specific lots of aluminum very quickly when it has the desire to do so.[31]   "[The delays allowed Metro to] continue charging a daily rent of 48 cents a ton… [and] at current rates [the Defendants] could collect about a quarter-billion dollars a year in rent.[32]

70.    In 2011, the LME hired Europe Economics to assess the chorus of purchaser complaints regarding warehouse delays.[33]  The Europe Economics report contained a number of policy recommendations, including that the implementation

---

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] *See* London Metal Exchange, Warehousing Studies, http://www.lme.com/en-gb/trading/warehousing-and-brands/warehousing/warehousing-studies/.

of rent rebates for material that is 'stranded' in a queue should be the subject of further discussion.  Citing only "feasibility issues", the LME refused to adopt the recommendation to even discuss the issue.[34]

### D. Defendants' manipulation caused an artificial increase in aluminum prices.

71.    Defendants' stockpiling of aluminum in warehouses, through the use of incentives to attract aluminum to warehouses and create a floor under the Midwest Premium; an agreement to treat the LME minimum output requirements as maximums; an agreement to allow netting of output so there is no per warehouse minimum; and an agreement to allow aluminum shipments from one warehouse to another count towards the LME output requirement, have all caused the Midwest Premium price for aluminum to double during the Class Period.[35]

72.    By intentionally manipulating both the demand curve and the supply curve for delivery of aluminum, Defendants have increased prices paid by purchasers of aluminum for delivery in the United States based on Midwest Premium price and any contract prices based on or derived from or including the Midwest Premium.

73.    As a result of the Defendants' anticompetitive agreements, the Defendants' storage revenue is higher than storage revenue in a non-manipulated

---

[34] *Id.*
[35] *See* Warehouse Inventory vs. Midwest Premium chart, *supra* at ¶23.

market.   Moreover, contrary to general economic indicators in a growth oriented economic environment, the Defendants' agreements caused an irrational movement in warehousing.   Typically, in a growth oriented environment, warehousing of aluminum should decrease.   However, the amount of aluminum held in the Detroit metropolitan area by the Defendants dramatically increased during the Class Period from approximately 850,000 tons to nearly 1.5 million tons in August 2013.[36]

74.   While the Defendants were stockpiling aluminum in warehouses, the LME simultaneously agreed to increase warehouse storage rates.   Pursuant to agreements among the Defendants, the daily storage rental per ton in the Detroit metropolitan area increased from $0.40 in 2010[37] to $0.41 in 2011[38] to $0.45 in 2012.[39]   In 2013, the rate increased to $0.48 per ton per day.[40]

---

[36] *See* CRAIN'S Article.

[37] *See* Nick Trevethan and Michael Urquhart, <u>Goldman to buy LME warehouse firm Metro</u>, REUTERS, (February 18, 2010 11:37 PM) http://www.reuters.com/article/2010/02/19/us-goldman-metro-idUSTRE61I0ZH20100219.

[38] *See* Carolyn Cui and Tatyana Shumsky, <u>Commodities Beckon Banks; Resource Storage Gives Lenders Profits in Tough Times, bu Some Clients Complain of Bottlenecks</u>, WALL STREET JOURNAL (July 5, 2011) http://online.wsj.com/article/SB10001424052702304803104576426131256469252.html.

[39] *See* <u>Banks outsmart metals storage rules to make millions</u>, REUTERS, (February 6, 2012 8:49 AM), http://www.reuters.com/article/2012/02/06/lme-warehouses-idUSL5E8D62DU20120206 ("February 2012 REUTERS Article").

75.     The LME's stated rationale for the storage rate increases was that increases in minimum output requirements for warehouses would decrease the amount of stored aluminum and justified an increase in the storage price. However, Defendants knew that the increase in minimum output requirements would have no measureable impact on storage levels because warehouses could continue to net output among warehouses and did not have to count input against the output requirements, so the Defendants could continue to move aluminum from one warehouse to another and still satisfy the output requirements. Meanwhile, the LME continued to receive a percentage of the storage rents charged by other Defendants.

76.     The large increase in the amount of aluminum in the Defendants' warehouses and the steady increases in the Midwest Premium price would not have occurred but for the artificial, anticompetitive effects of Defendants' agreements in unreasonable restraint of trade. These manipulations by the Defendants, along with the LME and the owners of other warehouses, have cost American consumers approximately $5 billion during the Class Period.[41]

---

[40] *See* July 20 N.Y. TIMES REPORT.
[41] *See* July 20 N.Y. TIMES REPORT.

**E.**     **Government investigations are ongoing in the United States and Europe.**

77.     In November 2012, Bloomberg News announced that the European Commission ("EC") initiated a review of the conduct and agreements alleged herein and contacted the LME.[42]

78.     On July 23, 2013, the Senate Banking Committee held hearings on the role of financial institutions in commodities markets.[43]

79.     In sworn testimony before the Senate,[44] Timothy Weiner, Global Risk Manager of Commodities and Metals for MillerCoors, joined by the Coca-Cola Company, Novelis, Ball Corp., Rexam, Dr. Pepper Snapple Group, D.G. Yuengling Brewing Company, North America Breweries, Rogue Brewery and Reynolds Consumer Products made the following statements about the impact of the Defendants' manipulations on the aluminum market.  Mr. Weiner testified as follows:

> U.S. bank holding companies have effective control of the LME, and they have created a bottleneck which limits the supply of aluminum. Aluminum prices in general and for can sheet in particular have

---

[42] *See* Agnieszka Troszkiewicz, <u>EU Plans to Discuss Metal Premiums and LME Warehouse 'Issue,'</u> REUTERS, (Nov. 9, 2012 5:57 PM), http://www.bloomberg.com/news/2012-11-09/eu-plans-to-discuss-metal-premiums-and-lme-warehouse-issue-1-.html.

[43] *See* Weiner Senate Testimony, Omarova Senate Testimony.

[44] *See* Weiner Testimony at pp. 3-5.

remained inflated relative to the massive oversupply and record production.

\*\*\*

[Delivery delays do] not happen with any of the other commodities we purchase. When we buy barley we receive prompt delivery, the same with corn, natural gas and other commodities. It is only with aluminum purchased through the LME that our property is held for an extraordinary period of time, with the penalty of additional rent and premiums to the warehouse owners, until we get access to the metal we have purchased.

\*\*\*

My company and others estimate that last year alone, the LME warehouse rules have imposed an additional $3 billion expense on companies that purchase aluminum.

\*\*\*

Although the LME has ordered strict minimum release requirements for warehouses controlled by the LME members, those minimums are being treated as maximums and continue to restrict the flow of metal out to the market.

\*\*\*

[T]he largest LME principal through December 2012 was Goldman Sachs, which through its ownership of Metro International Trade Services owns one of the largest warehouse complexes in the LME system. They own 29 of the 37 warehouse locations at the LME approved warehouse site in Detroit. This site houses approximately one quarter of the aluminum stored in LME facilities globally and over 70% of the available aluminum in North America. Henry Bath (100% owned by JP Morgan), Glencore and other trading companies also own LME warehouses.

\*\*\*

[W]e have asked the UK Financial Services Authority (recently reorganized as the Financial Control Authority) and the CFTC to regulate the LME system as it pertains to the commodity metals market.  Both agencies have indicated they are uncertain whether they have the regulatory authority necessary.

\*\*\*

[M]y company and other aluminum users have attempted over the last year to resolve our concerns directly with the LME.  We offered up sensible and reasonable recommendations to expedite and improve the current LME business practices and mitigate their adverse impact on aluminum purchasers. . . . The LME dismissed our proposals.

80.    The Commodity Futures Trading Commission is also investigating irregularities in the aluminum market and has issued subpoenas to Goldman and owners of other major warehouses, such as JP Morgan.[45]  The subpoenas reportedly "seek all internal documents, e-mails, correspondence, voice recordings, and other records concerning the warehouse operations dating back to January 2010[.]"[46]  "The subpoenas also demand documents and correspondence regarding the London Metals Exchange[.]"[47]  The federal inquiry reportedly has 30 "areas of interest."[48]

---

[45] *See* David Kocieniewski, U.S. Subpoenas Goldman in Inquiry of Aluminum Warehouses, N.Y. TIMES, August 12, 2013, at B3.

[46] *Id.*

[47] *Id.*

[48] *Id.*

**F.    In the face of government investigations, the Defendants have conceded they can readily make aluminum immediately available.**

81.    On July 31, 2013, after years of reaping millions of dollars in additional storage fees based on artificial warehouse output restrictions (and untold amounts from commodities trading), the Defendants conceded that they can readily increase the aluminum output from their warehouses.  In a recent statement, Goldman announced,

> "[i]n light of the concerns that end-users have raised about their access to aluminum they are holding in warehouses, Goldman Sachs is contacting end users to offer to swap any aluminum currently in the queue for immediately available aluminum so that they have access to the metal they need to make or package their products[.]"[49]

82.    Defendants' newfound empathy and promises are contrary to Defendants' conduct from 2010 until July 2013.  Either the Defendants on their own, or the LME Defendants on their own could have responded to these public complaints and could have ended Defendants' upward impact on aluminum prices during the Class Period.

83.    For example, Goldman could have quickly lifted its artificial restraints on output from Detroit area warehouses.  Further, for example, the LME could have disallowed netting of daily minimum requirements and could have disallowed warehousing incentives.  Only by working cooperatively together in agreement as

---

[49] *See* Goldman to offer Metro customers immediate access to aluminum, REUTERS, (July 31, 2013 12:06 pm), http://www.reuters.com/article/2013/07/31/goldman-aluminum-idUSL1N0G118V20130731.

alleged herein, have Defendants, through their parallel individual and joint or mutual conduct, been able to continue to inflate prices and storage costs to their continued mutual profit.

84.    The large increase in the amount of aluminum in Defendants' warehouses and the relative increases in the price of aluminum, especially the Midwest Premium price, would not have occurred but for the anticompetitive effect of Defendants' agreements in restraint of trade.

### G.    The Defendants' recent admissions impeach prior statements by the LME.

85.    As the Midwest Premium steadily increased, more than doubling during the Class Period, the LME denied any influence over these prices and erroneously claimed that they were driven by typical (non-manipulated) market factors.    On January 21, 2013, Chris Evans, the LME head of business development and a spokesman for the LME, stated that "I'm not sure there is a solution that the LME can provide to the market.  Ultimately the solution has to come from the market itself."[50]

---

[50] *See* <u>Solution to aluminum warehousing issues must come from market itself</u>: PLATTS, Jan. 21, 2013, reprinted with permission in blog comments, Novelis Blog Post of Nick Madden, Senior Vice President and Chief Supply Chain Officer, <u>Happy New Year? LME Warehouse Challenges Continue</u>, http://blog.novelis.com/happy-new-year-lme-warehouse-challenges-continue/.

33

86.     Likewise, in February 2012, the LME represented that it had no power to resolve the issue, suggesting purchasers simply stop paying the prices if they believe they are unfair.  The LME Chief Executive stated that "[i]t's not our job to change the market, it's our job to reflect the market and [the] fact that there are queues is an accurate reflection of too much cheap money chasing hard commodities."[51]

87.     Through the representations above and other similar statements, the LME has supported and acquiesced in the conduct of the Defendants, to the financial benefit of Goldman and LME and to the detriment of other market participants, while being fully knowledgeable of and complicit in the conduct alleged herein.

88.     Aluminum purchaser complaints continued throughout 2013 and the LME continued to reject proposals to reduce the artificially long warehouse queues.

## VI.     THE LME AND GOLDMAN MONOPOLY POWER

89.     Throughout the Class Period, the LME and other Defendants have maintained monopoly power in the Relevant Markets alleged in Section VII, below.  The Defendants have the ability to control the supply of tradable aluminum and thus to raise the price of aluminum, including the Midwest Premium price.

---

[51] *See* February 2012 REUTERS Article.

34

90.   LME has the right to approve any LME warehouse, including in the U.S., and has monopoly control over selection of the warehousing for exchange-traded aluminum in the U.S.

91.   The foregoing monopoly power extends to approving warehouse rent rates, minimum warehouse output rates, and other matters as decided by the LME's Warehouse Committee and Executive Committee.

92.   The Defendants control approximately 80 percent of LME certified metro Detroit warehousing space.

93.   The Defendants can control the output of LME-approved aluminum in metro Detroit by controlling the rate at which Goldman ships aluminum above the minimum load out rate.

94.   Since at least late 2010 or early 2011, the LME has had full knowledge of the facts alleged herein based on public complaints that they were inflating aluminum prices and that Defendants abused their monopoly powers as alleged herein.   The LME's prior knowledge and abuse of its monopoly power includes but is not limited to the following anticompetitive conduct: (i) agreeing with warehouse owners not to base minimum output requirements on a percentage of the metal capacity, metals stored in each warehouse, physical capacity, market demand, or some other reasonable basis; (ii) agreeing with warehouse owners not to factor warehouse input of aluminum into output requirements, thereby allowing

Defendants to shuttle aluminum from warehouse to warehouse; (iii) agreeing with warehouse owners to implement anti-competitive, unreasonably low minimum load-out rates; (iv) consenting to the conversion of the minimum rates to maximum rates in times of anomalously high storage; (v) approving the Defendants' charges and practices described herein; (vi) allowing repeated increases in the rent charged by Defendants and other warehouse owners; (vii) allowing the Defendants to pay incentives to divert more aluminum into LME warehousing in metro Detroit, and to restrain the aluminum therein; (viii) making statements to deter companies that purchase aluminum from challenging practices of the Defendants described herein; (ix) rejecting reasonable solutions to the anomalously long queues and increasing premiums; and (x) delegating unchecked power to, and failing to supervise the Defendants

95.    The Defendants have converted, with the LME's approval or acquiescence, the minimum aluminum output requirements into a maximum. Subsidized and incentivized by monopoly profits from their anticompetitive acts, the Goldman Defendants have made agreements in which they have paid as much as $230 per ton or more to producers to divert additional aluminum into metro Detroit warehousing.   The Defendants further abused the LME output requirements, with the LME's approval or acquiescence, by shuttling aluminum

from one warehouse to another and counting the transfers against the daily output requirement.

96.     The Defendants have abused their monopoly powers and have together engaged in anticompetitive conduct to abuse their monopoly powers in order to divert aluminum into and limit the free alienability of aluminum stored in metro Detroit warehouses.  Defendants have thereby decreased supply and inflated aluminum prices in the United States relative to prices in an efficient (non-manipulated) market, and have specifically caused increases in the Midwest Premium during the Class Period.  Meanwhile, the Defendants have reaped the rewards of increased revenue from charges to store the aluminum.

97.     Unless enjoined as requested herein, Defendants' ongoing agreements in restraint of trade and abuse of their monopoly powers will spread to other LME warehouses to an even greater extent than they already have, further exacerbating the anticompetitive impact on the U.S. economy.

## VII.   THE RELEVANT MARKETS

98.     The relevant product markets include, in the alternative, one or more of the following: (a) the market for aluminum in the United States; (b) the market for aluminum purchased and sold where the contract price for the aluminum includes or is based on, in any part, the Midwest Premium price or any price based on or derived therefrom.

99.     The alternative geographical markets are (a) the United States; and/or (b) Michigan, Ohio, Indiana, Illinois, Wisconsin, and Minnesota contiguous, and other areas where aluminum purchase contract prices include or are based on, in any part, the Midwest Premium price or any price based on or derived therefrom; and/or (c) The Class Juridictions where aluminum purchase contract prices include or are based on, in any part, the Midwest Premium price or any price based on or derived therefrom.  Pursuant to agreements with and acquiescence of the LME, the Defendants have manipulated the market in which Plaintiffs and other Class members purchased aluminum and have inflated prices in that market through anticompetitive conduct and agreements.

## VIII.  THE EFFECTS ON INTERSTATE COMMERCE AND INJURY TO PLAINTIFFS AND THE CLASS

100.    Defendants' unlawful acts alleged herein substantially affected interstate trade and commerce and caused antitrust injury to Plaintiffs and all Class members.

101.    Defendants' unlawful acts alleged herein have had a substantial anticompetitive effect on interstate commerce within the U.S. including by inflating aluminum prices, restraining aluminum supplies, and reducing the effective availability of the supplies of aluminum in metro Detroit and beyond.

102.   For example, Defendants' unlawful agreement has caused purchasers of aluminum in the United States to pay an unlawfully inflated and artificially and steadily increasing premium to purchase aluminum.

103.   As a direct result of Defendants' violations, Plaintiffs and the members of the Class have been damaged in their property or business, and have paid supra-competitive prices.

## IX.   ANTITRUST INJURY

104.   The restraint of trade and anticompetitive conduct alleged herein and engaged in by Defendants had severe adverse consequences on competition, prices, efficiency and transparency in storage services, and the level of available output of aluminum.   Plaintiffs and other members of the Class were deprived of normal, competitive aluminum prices.   Aluminum purchasers were subjected to artificially inflated prices and price-trends as a direct, foreseeable and intended result of the Defendants' unlawful and manipulative conduct.   As a consequence thereof, Plaintiffs and the Class suffered financial losses and were, therefore, injured in their business or property.

## CLASS ACTION ALLEGATIONS

105.   Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and/or (b)(3) on behalf of the following Nationwide Class:

> All persons who purchased aluminum in the United States from February 1, 2010 and thereafter pursuant to a contract where the

purchase price included the Midwest Premium or was based, in any part, on the Midwest Premium[52], including but not limited to an averaging over a period of days of any such premium.

106.   Plaintiffs also bring this action on behalf of themselves and as a class action under Federal Rules of Civil Procedure 23(a) and (b)(3), seeking damages pursuant to the antitrust, unfair competition, unjust enrichment and consumer protection laws of the Class Jurisdictions, as well as the unjust enrichment laws of Missouri, Massachusetts, and Illinois (collectively the "Indirect Purchaser States").

107.   The following claims are brought by Plaintiffs on behalf of themselves and entities in the Indirect Purchaser States ("Damages Class"):

> All persons in each of the Indirect Purchaser States who purchased aluminum in the United States from February 1, 2010 and thereafter pursuant to a contract where the purchase price included the Midwest Premium or was based, in any part, on the Midwest Premium[53], including but not limited to an averaging over a period of days of any such premium.

---

[52] As explained above, "Midwest Premium" is also sometimes referred to as the Platts MW Midwest Premium or the Midwest Transaction Premium price. "Midwest Premium" as used in the class definition and throughout this Complaint refers to this premium used for most physical buying and selling of aluminum in North America regardless of the specific terminology used to describe it.

[53] As explained above, "Midwest Premium" is also sometimes referred to as the Platts MW Midwest Premium or the Midwest Transaction Premium price. "Midwest Premium" as used in the class definition and throughout this Complaint refers to this premium used for most physical buying and selling of aluminum in North America regardless of the specific terminology used to describe it.

108.   The Class excludes Defendants and any entity in which Defendants have a controlling interest, and their officers, directors, legal representatives, successors and assigns.

109.   The Class is so numerous that joinder of all members is impracticable.

110.   A Class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

111.   Plaintiffs' claims are typical of the claims of the Class.  As alleged herein, Plaintiffs and members of the Class all sustained damages arising out of the Defendants' same course of unlawful conduct.

112.   There are questions of law and fact common to the Classes, including but not limited to:

- Whether Defendants monopolized, attempted to monopolize or conspired to monopolize in violation of law;

- Whether Defendants made agreements in unreasonable restraint of trade;

- Whether Defendants combined, conspired and agreed to restrain supplies or inflate prices of aluminum;

- Whether such violations inflated prices of aluminum;

- Whether such inflation caused antitrust injury to the property of Plaintiffs and Class members;

41

- Whether damages, restitution, equitable, injunctive, compulsory, or other relief is warranted; and

- Whether injunctive relief enjoining the reoccurrence of Defendants' conduct and/or declaratory relief that such conduct is unlawful, is warranted.

113.   Plaintiffs' claims are typical of the claims of the other members of the Class it seeks to represent.   Plaintiffs and members of the Class all sustained damages arising out of Defendants' same course of unlawful conduct alleged herein.

114.   Plaintiffs will fully and adequately protect the interests of all members of the Class.   Plaintiffs have retained counsel experienced in complex antitrust class actions including class actions involving complex financial transactions and complex schemes in violation of antitrust laws.   Plaintiffs have no interests which are adverse to or in conflict with other members of the Class.

115.   The questions of law and fact common to the members of the Class predominate over any questions which may affect only individual members.

116.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable.   The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts, and would also create a risk of

inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated.  It would do so without sacrificing procedural fairness or bringing about other undesirable results.

117.   The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would not be objectionable.  Plaintiffs anticipate no difficulty in the management of this action as a class action.

118.   Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

119.   Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Class would create a risk of adjudication with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other

members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

120.   Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

121.   Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## FIRST CLAIM FOR RELIEF

### Violation of Section 1 of the Sherman Act
### (on behalf of Plaintiffs and the Nationwide Class)

122.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

123.   Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

124.   The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by

their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

125.   At least as early as February 2010, and continuing until at least July 31, 2013, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for aluminum, thereby creating anticompetitive effects.

126.   The anticompetitive acts were intentionally directed at the United States market for aluminum and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for aluminum in the United States.

127.   The conspiratorial acts and combinations have caused unreasonable restraints in the market for aluminum.

128.   As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Class who purchased aluminum have been harmed by being forced to pay inflated prices for aluminum and products containing aluminum.

129.   In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth herein.

45

130.   Defendants' conspiracy had the following effects, among others:

(a)    Prices in the market for aluminum have been raised artificially;

(b)    Supplies of aluminum have been artificially suppressed or tied up;

(c)    Plaintiffs and members of the Nationwide Class who purchased aluminum have been deprived of the benefits of free and open competition.

131.   Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for aluminum than they would have paid and will pay in the absence of the conspiracy.

132.   Plaintiffs and members of the Nationwide Class will continue to be subject to Defendants' unlawful conduct, which will deprive Plaintiffs and members of the Nationwide Class of the benefits of free competition, including competitively-priced aluminum and aluminum products.

133.   Plaintiffs and members of the Nationwide Class will continue to be harmed by overpayment for aluminum, which they require to operate their businesses.

134.   Plaintiffs and members of the Nationwide Class continue to purchase aluminum and products containing aluminum.

135.   Aluminum continues to be sold at artificially inflated prices.

136.   Plaintiffs and members of the Nationwide Class will be at the mercy of Defendants' unlawful conduct until the Court orders an injunction.

46

137.   Plaintiffs and members of the Nationwide Class are entitled to an injunction preventing and restraining the violations of Defendants alleged herein.

## SECOND CLAIM FOR RELIEF

### Violation of Section 2 of the Sherman Act
### (on behalf of Plaintiffs and the Nationwide Class)

138.   Plaintiff incorporates by reference the allegations in the preceding paragraphs.

139.   Defendants monopolized, attempted to monopolize, and/or conspired to monopolize the relevant market(s) as previously alleged herein in violation of Section 2 of the Sherman Act, 15 U.S.C. §2.

140.   The Goldman Defendants and the LME, who have monopoly power over the relevant market, agreed with one another and other Defendants to abuse their power for their benefit.  Further, the LME gave the Goldman Defendants monopoly power and apparent authority to conduct its dominant United States aluminum storage business as it saw fit.  The Defendants have done so in order to limit aluminum supplies available on the relevant market by increasing aluminum stored in Goldman's LME approved warehouses and, thereby, inflating aluminum prices as well as the storage costs paid directly to Defendants.

141.   This conduct and its resulting impact on the United States aluminum market occurred in or affected interstate commerce.

142.   As a direct and foreseeable result, Plaintiff and members of the Nationwide Class have been injured in their property in that they had to pay artificially high prices for aluminum.

143.   Plaintiffs and members of the Nationwide Class continue to purchase aluminum and products containing aluminum.

144.   Aluminum continues to be sold at artificially inflated prices.

145.   Plaintiffs and members of the Nationwide Class will be at the mercy of Defendants' unlawful conduct until the Court orders an injunction.

146.   Plaintiffs and members of the Nationwide Class are entitled to an injunction preventing and restraining the violations of Defendants alleged herein.

## THIRD CLAIM FOR RELIEF

### Violation of State Antitrust Statutes
### (on behalf of Plaintiffs and the Damages Class)

147.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

148.   Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of state antitrust and unfair competition laws.

149.   From as early as February 2010 until at least July 31, 2013, the exact dates being unknown to Plaintiffs, Defendants entered into a continuing agreement,

understanding, and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for aluminum, thereby creating anticompetitive effects.

150. Defendants also monopolized, attempted to monopolize, and/or conspired to monopolize the relevant market(s) as previously alleged herein in violation of the state laws set forth below. The Goldman Defendants and the LME, who have monopoly power over the relevant market, agreed with one another and other Defendants to abuse their power for their benefit. Further, the LME gave the Goldman Defendants monopoly power and apparent authority to conduct its dominant United States aluminum storage business as it saw fit. The Defendants have done so in order to limit aluminum supplies available on the relevant market by increasing aluminum stored in Goldman's LME approved warehouses and, thereby, inflating aluminum prices as well as the storage costs paid directly to Defendants.

151. The anticompetitive acts were intentionally directed at the United States market for aluminum and had a substantial and foreseeable effect on interstate commerce by raising prices for aluminum throughout the United States.

152. The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize and/or maintain artificially high prices for aluminum in the United States.

153.   In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

(a)     participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to actions they would take to ensure that the increases in the cost of storing aluminum and strategic limits on aluminum transfers would increase, inflate, maintain, or stabilize aluminum prices paid by Plaintiffs and members of the Damages Class with respect to aluminum sold in the United States; and

(b)     participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

154.   Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of the following state antitrust statutes.

155.   Defendants have entered into an unlawful agreement in restraint of trade and monopolized, attempted to monopolize, and/or conspired to monopolize the relevant market(s) as previously alleged herein in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:
(1) aluminum price competition was restrained, suppressed, and eliminated
throughout Arizona; (2) aluminum prices were raised, fixed, maintained, and
stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members
of the Damages Class were deprived of free and open competition; and (4)
Plaintiffs and members of the Damages Class paid supracompetitive, artificially
inflated prices for aluminum and products containing aluminum.

(b)     During the Class Period, Defendants' illegal conduct substantially
affected Arizona commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct,
Plaintiffs and members of the Damages Class have been injured in their business
and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants entered into agreements in
restraint of trade and monopolized, attempted to monopolize, and/or conspired to
monopolize the relevant market(s) as previously alleged herein in violation of Ariz.
Rev. Stat. §§ 44-1401, *et seq.*  Accordingly, Plaintiffs and members of the
Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401,
*et seq.*

156.   Defendants have entered into an unlawful agreement in restraint of
trade and monopolized, attempted to monopolize, and/or conspired to monopolize

51

the relevant market(s) as previously alleged herein in violation of the California Business and Professions Code, §§ 16700, *et seq.*

(a)     During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720 of the California Business and Professions Code.  Defendants, each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for aluminum at supracompetitive levels.

(b)     The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for aluminum.

(c)     For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following: (1) raising the price of aluminum; and (2) allocating among themselves the output of aluminum.

(d)     The combination and conspiracy alleged herein has had, inter alia, the following effects upon the commerce of California: (1) Price competition in the

52

sale of aluminum has been restrained, suppressed, manipulated and/or eliminated in the State of California; (2) Prices for aluminum sold by Defendants and their co-conspirators have been fixed, raised, stabilized, or pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) Those who purchased aluminum or materials containing aluminum have been deprived of the benefit of free and open competition in the aluminum market.

(e) As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for aluminum than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

157. Defendants have entered into an unlawful agreement in restraint of trade and monopolized, attempted to monopolize, and/or conspired to monopolize the relevant market(s) as previously alleged herein in violation of the District of Columbia Official Code §§ 28-4501, *et seq.*

(a) Defendants' combinations or conspiracies had the following effects: (1) aluminum price competition was restrained, suppressed, and eliminated

53

throughout the District of Columbia; (2) aluminum prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased aluminum in the District of Columbia were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased aluminum in the District of Columbia, paid artificially inflated prices for aluminum, including in the District of Columbia.

(b)     During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

158.  Defendants have entered into an unlawful agreement in restraint of trade and monopolized, attempted to monopolize, and/or conspired to monopolize

the relevant market(s) as previously alleged herein in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq.*

(a)     Defendants' unlawful conduct had the following effects: (1) aluminum price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) aluminum prices were artificially raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid artificially inflated prices for aluminum.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Hawaii Revised Statutes Annotated §§ 480-4, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated §§ 480-4, *et seq.*

159.  Defendants have entered into an unlawful agreement in restraint of trade and monopolized, attempted to monopolize, and/or conspired to monopolize

the relevant market(s) as previously alleged herein in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) aluminum price competition was restrained, suppressed, and eliminated throughout Illinois; (2) aluminum prices were artificially raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid artificially inflated prices for aluminum.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 740 Illinois Compiled Statutes 10/1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under 740 Illinois Compiled Statutes 10/1, *et seq.*

160.   Defendants have entered into an unlawful agreement in restraint of trade and monopolized, attempted to monopolize, and/or conspired to monopolize

the relevant market(s) as previously alleged herein in violation of the Iowa Code §§ 553.1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) aluminum price competition was restrained, suppressed, and eliminated throughout Iowa; (2) aluminum prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid artificially inflated prices for aluminum.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

161.   Defendants have entered into an unlawful agreement in restraint of trade and monopolized, attempted to monopolize, and/or conspired to monopolize

the relevant market(s) as previously alleged herein in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

(b)     Defendants' combinations or conspiracies had the following effects: (1) aluminum price competition was restrained, suppressed, and eliminated throughout Kansas; (2) aluminum prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid artificially inflated prices for aluminum.

(c)     During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

(d)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(e)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

162.  Defendants have entered into an unlawful agreement in restraint of trade in and monopolized, attempted to monopolize, and/or conspired to

58

monopolize the relevant market(s) as previously alleged herein violation of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects: (1) aluminum price competition was artificially restrained, suppressed, and eliminated throughout Maine; (2) aluminum prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition: and (4) Plaintiffs and members of the Damages Class paid artificially inflated prices for aluminum.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10. §§ 1101, *et seq.*

163.    Defendants have entered into an unlawful agreement in restraint of trade and monopolized, attempted to monopolize, and/or conspired to monopolize

the relevant market(s) as previously alleged herein in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

(a)   Defendants' combinations or conspiracies had the following effects: (1) aluminum price competition was restrained, suppressed, and eliminated throughout Michigan; (2) aluminum prices were artificially raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid artificially inflated prices for aluminum.

(b)   During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

(c)   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

164.   Defendants have entered into an unlawful agreement in unreasonable restraint of trade and monopolized, attempted to monopolize, and/or conspired to

monopolize the relevant market(s) as previously alleged herein in violation of the
Minnesota Statutes Annotated §§ 325D.49, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:
(1) aluminum price competition was restrained, suppressed, and eliminated
throughout Minnesota; (2) aluminum prices were artificially raised, fixed,
maintained, and stabilized at artificially high levels throughout Minnesota; (3)
Plaintiffs and members of the Damages Class were deprived of free and open
competition; and (4) Plaintiffs and members of the Damages Class paid artificially
inflated prices for aluminum.

(b)     During the Class Period Defendants' illegal conduct substantially
affected Minnesota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct,
Plaintiffs and members of the Damages Class have been injured in their business
and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements
in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq.*
Accordingly, Plaintiffs and members of the Damages Class seek all relief available
under Minnesota Stat. §§ 325D.49, *et seq.*

165.   Defendants have entered into an unlawful agreement in restraint of
trade and monopolized, attempted to monopolize, and/or conspired to monopolize

61

the relevant market(s) as previously alleged herein in violation of the Mississippi

Code Annotated §§ 75-21-1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:

(1) aluminum competition was restrained, suppressed, and eliminated throughout

Mississippi; (2) aluminum prices were artificially raised, fixed, maintained, and

stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and

members of the Damages Class, including those who resided in Mississippi and/or

purchased aluminum in Mississippi were deprived of free and open competition,

including in Mississippi: and (4) Plaintiffs and members of the Damages Class,

including those who resided in Mississippi and/or purchased aluminum in

Mississippi paid artificially inflated prices for aluminum, including in Mississippi.

(b)     During the Class Period, Defendants' illegal conduct substantially

affected Mississippi commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct,

Plaintiffs and members of the Damages Class have been injured in their business

and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements

in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.*

Accordingly, Plaintiffs and members of the Damages Class seek all relief available

under Mississippi Code Ann. § 75-¬21-1, *et seq.*

166.   Defendants have entered into an unlawful agreement in restraint of trade and monopolized, attempted to monopolize, and/or conspired to monopolize the relevant market(s) as previously alleged herein in violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) aluminum price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) aluminum prices were artificially raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid \ artificially inflated prices for aluminum.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

167.   Defendants have entered into an unlawful agreement in restraint of trade and monopolized, attempted to monopolize, and/or conspired to monopolize the relevant market(s) as previously alleged herein in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects: (1) aluminum price competition was restrained, suppressed, and eliminated throughout Nevada; (2) aluminum prices were artificially raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class, including those who resided in Nevada and/or purchased aluminum in Nevada, were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class, including those who resided in Nevada and/or purchased aluminum in Nevada, paid artificially inflated prices for aluminum.

(b)      During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.060, *et seq.*

64

Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

168.   Defendants have entered into an unlawful agreement in restraint of trade and monopolized, attempted to monopolize, and/or conspired to monopolize the relevant market(s) as previously alleged herein in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq.*

(a)   Defendants' combinations or conspiracies had the following effects: (1) aluminum price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) aluminum prices were artificially raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid artificially inflated prices for aluminum.

(b)   During the Class Period Defendants' illegal conduct substantially affected New Hampshire commerce.

(c)   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et*

*seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq.*

169.   Defendants have entered into an unlawful agreement in restraint of trade and monopolized, attempted to monopolize, and/or conspired to monopolize the relevant market(s) as previously alleged herein in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

(a)   Defendants' combinations or conspiracies had the following effects: (1) aluminum price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) aluminum prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid artificially inflated prices for aluminum.

(b)   During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

(c)   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann.§§ 57-¬1-1, *et seq.*

170.  Defendants have entered into an unlawful agreement in restraint of trade and monopolized, attempted to monopolize, and/or conspired to monopolize the relevant market(s) as previously alleged herein in violation of the New York General Business Laws §§ 340, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects: (1) aluminum price competition was restrained, suppressed, and eliminated throughout New York; (2) aluminum prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class, including those who resided in New York and/or purchased aluminum in New York, were deprived of free and open competition, including in New York; and (4) Plaintiffs and members of the Damages Class, including those who resided in New York, paid artificially inflated prices for aluminum when they purchased, including in New York, aluminum, or purchased, including in New York, aluminum that was otherwise of lower quality, than would have been absent the conspirators' illegal acts, or were unable to purchase aluminum that they would have otherwise have purchased absent the illegal conduct.

67

(b)     During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq.* The conduct set forth above is a per se violation of the Act.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq.*

171.   Defendants have entered into an unlawful agreement in restraint of trade and monopolized, attempted to monopolize, and/or conspired to monopolize the relevant market(s) as previously alleged herein in violation of the North Carolina General Statutes §§ 75-1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) aluminum price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) aluminum prices were artificially raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased aluminum were deprived of free and open

68

competition, including in North Carolina; and (4) Plaintiffs and members of the

Damages Class, including those who resided in North Carolina and/or purchased

aluminum in North Carolina, paid artificially inflated prices for aluminum.

(b)     During the Class Period, Defendants' illegal conduct substantially

affected North Carolina commerce.  As a direct and proximate result of

Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have

been injured in their business and property and are threatened with further injury.

(c)     By reason of the foregoing, Defendants have entered into agreements

in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.*

Accordingly, Plaintiffs and members of the Damages Class seek all relief available

under North Carolina Gen. Stat. §§ 75-1, *et seq.*

172.    Defendants have entered into an unlawful agreement in restraint of

trade and monopolized, attempted to monopolize, and/or conspired to monopolize

the relevant market(s) as previously alleged herein in violation of the North Dakota

Century Code §§ 51-08.1-01, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:

(1) aluminum price competition was restrained, suppressed, and eliminated

throughout North Dakota; (2) aluminum prices were artificially raised, fixed,

maintained, and stabilized at artificially high levels throughout North Dakota; (3)

Plaintiffs and members of the Damages Class were deprived of free and open

69

competition; and (4) Plaintiffs and members of the Damages Class paid artificially inflated prices for aluminum.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

173.   Defendants have entered into an unlawful agreement in restraint of trade and monopolized, attempted to monopolize, and/or conspired to monopolize the relevant market(s) as previously alleged herein in violation of the Oregon Revised Statutes §§ 646.705, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) aluminum price competition was restrained, suppressed, and eliminated throughout Oregon; (2) aluminum prices were artificially raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and

(4) Plaintiffs and members of the Damages Class paid artificially inflated prices for aluminum.

(b)     During the Class Period Defendants' illegal conduct had a substantial effect on Oregon commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

174.   Defendants have entered into an unlawful agreement in restraint of trade and monopolized, attempted to monopolize, and/or conspired to monopolize the relevant market(s) as previously alleged herein in violation of the South Dakota Codified Laws §§ 37-1-3.1., *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) aluminum price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) aluminum prices were artificially raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class, including those who resided in

71

South Dakota and/or purchased aluminum, were deprived of free and open

competition including in South Dakota; and (4) Plaintiffs and members of the

Damages Class, including those who resided in South Dakota and/or purchased

aluminum in South Dakota, paid artificially inflated prices for aluminum.

(b)     During the Class Period, Defendants' illegal conduct had a substantial

effect on South Dakota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct,

Plaintiffs and members of the Damages Class have been injured in their business

and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements

in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et

seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief

available under South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

175.   Defendants have entered into an unlawful agreement in restraint of

trade and monopolized, attempted to monopolize, and/or conspired to monopolize

the relevant market(s) as previously alleged herein in violation of the Tennessee

Code Annotated §§ 47-25-101, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:

(1) aluminum price competition was restrained, suppressed, and eliminated

throughout Tennessee; (2) aluminum prices were artificially raised, fixed,

72

maintained, and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class, including those who resided in Tennessee and/or purchased aluminum were deprived of free and open competition including in Tennessee; and (4) Plaintiffs and members of the Damages Class, including those who resided in Tennessee, and/or purchased aluminum in Tennessee, paid artificially inflated prices for aluminum.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(c)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq.*

176.   Defendants have entered into an unlawful agreement in restraint of trade and monopolized, attempted to monopolize, and/or conspired to monopolize the relevant market(s) as previously alleged herein in violation of the Utah Code Annotated §§ 76-10-911, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) aluminum price competition was artificially restrained, suppressed, and

73

eliminated throughout Utah; (2) aluminum prices were artificially raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid artificially inflated prices for aluminum.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-911*, et seq.*

177.   Defendants have entered into an unlawful agreement in restraint of trade and monopolized, attempted to monopolize, and/or conspired to monopolize the relevant market(s) as previously alleged herein in violation of the 9 Vermont Stat. Ann. §§ 2451, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) aluminum price competition was restrained, suppressed, and eliminated

throughout Vermont; (2) aluminum prices were artificially raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid artificially inflated prices for aluminum.

(b)     During the Class Period Defendants' illegal conduct had a substantial effect on Vermont commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 9 Vermont Stat. Ann. §§ 2451, *et seq.*  Plaintiffs are entitled to relief pursuant to 9 Vermont Stat. Ann. § 2465 and any other applicable authority.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under 9 Vermont Stat. Ann. §§ 2451, *et seq.*

178.   Defendants have entered into an unlawful agreement in restraint of trade and monopolized, attempted to monopolize, and/or conspired to monopolize the relevant market(s) as previously alleged herein in violation of the West Virginia Code §§ 47-18-1, *et seq.*

75

(a)     Defendants' combinations or conspiracies had the following effects: (1) aluminum price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) aluminum prices were artificially raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class, including those who resided in West Virginia and/or purchased aluminum were deprived of free and open competition including in West Virginia; and (4) Plaintiffs and members of the Damages Class, including those who resided in West Virginia and/or purchased aluminum in West Virginia, paid artificially inflated prices for aluminum.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia §§ 47-18-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia §§ 47-18-1, *et seq.*

179.  Defendants have entered into an unlawful agreement in restraint of trade and monopolized, attempted to monopolize, and/or conspired to monopolize

76

the relevant market(s) as previously alleged herein in violation of the Wisconsin Statutes §§ 133.01, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects: (1) vehicle price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) vehicle prices were artificially raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid artificially inflated prices for aluminum.

(b)      During the Class Period Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq.*

180.   Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants'

unlawful combination, contract, conspiracy, and agreement and Defendants' unlawful monopoly, attempts to monopolize, and/or conspiracy to monopolize the relevant market(s) as previously alleged herein. Plaintiffs and members of the Damages Class have paid more for aluminum than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

181.   In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiffs and the members of the Damages Class.

182.   Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## FOURTH CLAIM FOR RELIEF

### Violation of State Consumer Protection Statutes
### (on behalf of Plaintiffs and the Damages Class)

183.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

184.   Defendants knowingly engaged in unlawful, unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

185.   Defendants have knowingly entered into an unlawful agreement in restraint of trade and monopolized, attempted to monopolize, and/or conspired to monopolize the relevant market(s) as previously alleged herein in violation of the Arkansas Code Annotated, § 4-88-101.

(a)     Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which aluminum was sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

79

(c)    Defendants' unlawful conduct had the following effects: (1) aluminum price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) aluminum prices were artificially raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid artificially inflated prices for aluminum.

(d)    During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

(e)    As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

(f)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

186.   Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*

(a)      During the Class Period, Defendants marketed, sold, stored, or distributed, aluminum and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

(b)      During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers.

(c)      This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

(d)      The Defendants' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the following: (1) the violations of Sections 1 and 2 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq.*, of the California Business and Professions Code, set forth above;

(e)     Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.*, of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

(f)     Defendants' acts or practices are unfair to purchasers of aluminum in the State of California within the meaning of Section 17200, California Business and Professions Code; and

(g)     Defendants' unlawful conduct had the following effects: (1) aluminum price competition was restrained, suppressed, and eliminated throughout California; (2) aluminum prices were raised, fixed, maintained, and stabilized at artificially high levels throughout California; (3) Plaintiffs and members of the Damages Class, including those who resided in California and/ or purchased aluminum in California, were deprived of free and open competition, including in California; and (4) Plaintiffs and members of the Damages Class, including those who resided in California and/or purchased aluminum in California, paid artificially inflated prices for aluminum in California.

(h)     Defendants' acts and practices are unlawful, fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

(i)     The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

(j)     The unlawful, fraudulent, deceptive, and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and the members of the Damages Class to pay artificially-inflated prices for aluminum. Plaintiffs and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

(k)     As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition.  Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

187.   Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or

83

non-competitive levels, the prices at which aluminum was sold, distributed, or obtained in the District of Columbia.

(b)     The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904.

(c)     During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce and consumers.

(d)     Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for aluminum.  Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

(e)     Moreover, Plaintiffs lacked any meaningful choice in purchasing aluminum because they were unaware of the unlawful overcharge and because they had to purchase aluminum for their business purposes.

(f)     Defendants' conduct with regard to sales of aluminum, including their illegal conspiracy to secretly fix, control and/or maintain the price of aluminum at supracompetitive levels and overcharge purchasers, and Defendants' monopoly, attempts to monopolize, and/or conspiracy to monopolize the relevant market(s) as previously alleged herein, were substantively unconscionable because they were

one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.  Defendants grossly took unfair advantage of Plaintiffs.

(g)     Defendants' unlawful conduct had the following effects: (1) aluminum price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) aluminum prices were artificially raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the Damages Class paid artificially inflated prices for aluminum.

(h)     The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and the members of the Damages Class and the prices paid by them for aluminum, due to the inflated prices paid by Plaintiffs and Class members for aluminum.

(i)     As a direct and proximate result of the Defendants' conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

188.   Defendants have engaged in unfair competition or unlawful, unfair, unconscionable, or deceptive acts or practices, including Defendants' monopoly, attempts to monopolize, and/or conspiracy to monopolize the relevant market(s) as previously alleged herein, in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

(a)   Defendants' unlawful conduct had the following effects: (1) aluminum price competition was restrained, suppressed, and eliminated throughout Florida; (2) aluminum prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; (4) Plaintiffs and members of the Damages Class paid artificially inflated prices for aluminum; and (5) Reasonable purchasers in Florida were deceived into believing that they were paying competitive prices for aluminum.

(b)   During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

(c)   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)   Defendants have engaged in unfair competition or unlawful, unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and,

accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

189.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq.*

(a)   Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which aluminum was sold, distributed, or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)   Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for aluminum.  Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.  Moreover, Plaintiffs lacked any meaningful choice in purchasing aluminum because they were unaware of the unlawful overcharge and because they had to purchase aluminum for business purposes.  Defendants' conduct with regard to sales of aluminum, including their illegal conspiracy to secretly fix, control and/or maintain the price of aluminum at supracompetitive levels and overcharge purchasers, and

Defendants' monopoly, attempts to monopolize, and/or conspiracy to monopolize the relevant market(s) as previously alleged herein, were substantively unconscionable because they were one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.  Defendants grossly took unfair advantage of Plaintiffs.

(c)     The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in violation of N.M.S.A.§ 57-12-3, in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiffs and the members of the Damages Class and the prices paid by them for aluminum as set forth in N.M.S.A. § 57-12-2E, due to the inflated prices paid by Plaintiffs and Class members for aluminum.

(d)     Defendants' unlawful conduct had the following effects: (1) aluminum price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) aluminum prices were artificially raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid artificially inflated prices for aluminum.

(e)     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

88

(f)     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

(g)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

190.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which aluminum was sold, distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     Further, Defendants monopolized, attempted to monopolize, and/or conspired to monopolize the relevant market(s) as previously alleged herein.

(c)     Defendants deceptively led purchasers, such as Plaintiffs and Class members, to believe that the aluminum they had purchased had been sold at legal

competitive prices, when they had in fact been sold at collusively obtained inflated prices, that were passed on to them.

(d)     The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in injuries to purchasers and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

(e)     Because of Defendants' unlawful trade practices in the State of New York, New York purchasers who indirectly purchased aluminum were misled to believe that they were paying a fair price for aluminum or the price increases for aluminum were for valid business reasons; and similarly situated purchasers were potentially affected by Defendants' conspiracy.

(f)     Defendants' unlawful conduct had the following effects: (1) aluminum price competition was restrained, suppressed, and eliminated throughout New York; (2) aluminum prices were artificially raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class, who resided in and/or made purchases of aluminum in New York, were deprived of free and open competition and were subject to Defendants' deceptive practices in New York; and (4) Plaintiffs and members of the Damages Class, who resided in and/or made purchases of

90

aluminum in New York, paid supracompetitive, artificially inflated prices for aluminum, and were subjected to Defendants' deceptive practices.

(g)    Defendants knew that their unlawful trade practices with respect to pricing aluminum would have an impact on all purchasers in New York and not just the Defendants' direct customers.

(h)    Defendants knew that their unlawful trade practices with respect to pricing aluminum would have a broad impact, causing class members who indirectly purchased aluminum to be injured by paying more for aluminum than they would have paid in the absence of Defendants' unlawful trade acts and practices.

(i)    During the Class Period, Defendants marketed, sold, or distributed aluminum in New York and their illegal conduct substantially affected New York commerce and New York purchasers.

(j)    During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled manufactured, sold, and/or distributed aluminum in New York.

(k)    Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

191. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*

(a)    Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which aluminum was sold, distributed, or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)    Further, Defendants monopolized, attempted to monopolize, and/or conspired to monopolize the relevant market(s) as previously alleged herein.

(c)    The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in injuries to purchasers of aluminum, and broad adverse impact on the public at large, and harmed the public interest of North Carolina purchasers in an honest marketplace in which economic activity is conducted in a competitive manner.

(d)    Defendants' unlawful conduct had the following effects upon purchasers of aluminum in North Carolina: (1) aluminum price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) aluminum prices were artificially raised, fixed, maintained, and stabilized at artificially high

92

levels throughout North Carolina; (3) Plaintiffs and members of the Damages
Class, including those who resided in North Carolina and/or purchased aluminum
in North Carolina, were deprived of free and open competition including in North
Carolina; and (4) Plaintiffs and members of the Damages Class, including those
who resided in North Carolina and/or purchased aluminum in North Carolina, paid
artificially inflated prices for aluminum.

(e)     During the Class Period, Defendants' illegal conduct substantially
affected North Carolina commerce and purchasers of aluminum.  Defendants'
price-fixing conspiracy could not have succeeded absent deceptive conduct by
Defendants to cover up their illegal acts.  Secrecy was integral to the formation,
implementation and maintenance of Defendants' price-fixing conspiracy.
Defendants committed inherently deceptive and self-concealing actions, of which
Plaintiffs could not possibly have been aware.  Moreover, Defendants deceptively
concealed their unlawful activities by conducting meetings and conversations in
secret.

(f)     During the Class Period, each of the Defendants named herein,
directly, or indirectly and through affiliates they dominated and controlled,
manufactured, marketed, sold and/or distributed aluminum.

(g)     Plaintiffs and members of the Damages Class seek actual damages for
their injuries caused by these violations in an amount to be determined at trial and

93

are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

192. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*

(a)    Defendants' combinations or conspiracies, and Defendants' monopoly, attempts to monopolize, and/or conspiracy to monopolize the relevant market(s) as previously alleged herein, had the following effects: (1) aluminum price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) aluminum prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid artificially inflated prices for aluminum.

(b)    During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

94

(d)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

193.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which aluminum was sold, distributed, or obtained in Vermont.

(b)     Further, Defendants monopolized, attempted to monopolize, and/or conspired to monopolize the relevant market(s) as previously alleged herein.

(c)     Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for aluminum.  Defendants owed a duty to disclose such facts, and Defendants breached that duty by their silence.  Defendants misrepresented to all purchasers during the Class Period that Defendants' aluminum prices were competitive and fair.

95

(d)     Defendants' unlawful conduct had the following effects: (1) aluminum price competition was restrained, suppressed, and eliminated throughout Vermont; (2) aluminum prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid artificially inflated prices for aluminum.

(e)     As a direct and proximate result of the Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.  That loss was caused by Defendants' willful and deceptive conduct, as described herein.

(f)     Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of aluminum, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing aluminum at prices set by a free and fair market.  Defendants' misleading conduct and unconscionable activities constitute unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

96

## FIFTH CLAIM FOR RELIEF

**Unjust Enrichment**
**(on behalf of Plaintiffs and the Damages Class)**

194.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

195.   Plaintiffs bring this claim under the laws of all states listed in the Third and Fourth Claims, *supra*.  Plaintiffs also bring this claim under the laws of Missouri and Massachusetts on behalf of the Plaintiffs who have their primary places of business in those  states and the class members in those  states.

196.   As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of aluminum.

197.   Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs or the members of the Damages Class for aluminum.

198.   Plaintiffs and the members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct.  Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from

97

which Plaintiffs and the members of the Damages Class may make claims on a *pro rata* basis.

199.   Pursuit of any remedies against the firms from whom Plaintiffs and the Class members purchased aluminum subject to Defendants' conspiracy would have been futile, given that those firms did not take part in Defendants' conspiracy.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs and the Class(es) and award the following relief:

A.   That this action be certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as the representatives of the Class(es) and Plaintiffs' counsel as counsel for the Class(es);

B.   For an order declaring and adjudging that Defendants' challenged conduct is unlawful;

C.   For an order enjoining Defendants' challenged conduct;

D.   For a judgment awarding Plaintiffs and the Class(es) compensatory, consequential, and general damages in an amount to be determined at trial;

E.   For a judgment awarding Plaintiffs and the Class(es) treble damages and all other available damages whether punitive, exemplary or otherwise;

F.     For an order of restitution and/or disgorgement of Defendants' ill-gotten gains, and the imposition of an equitable constructive trust over all such amounts for the benefit of the Class(es);

G.     For an award to Plaintiffs and the Class(es) of their costs of suit, including reasonable attorneys' and experts' fees and expenses;

H.     For an award of pre- and post-judgment interest;

I.     For any other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated:  September 11, 2013

Respectfully submitted,

_/s/Gerard V. Mantese_____
Gerard V. Mantese (P34424)
David Honigman (P33146)
Brendan H. Frey (P70893)
David Hansma (P71056)
MANTESE HONIGMAN ROSSMAN
    AND WILLIAMSON, P.C.
1361 E. Big Beaver Rd.
Troy, Michigan 48083
Telephone:  (248) 457-9200
gmantese@manteselaw.com
dhonigman@manteselaw.com
bfrey@manteselaw.com
dhansma@manteselaw.com

Don Barrett
BARRETT LAW GROUP, P.A.
P.O. Box 927
404 Court Square
Lexington, MS 39095
Telephone: (662) 834-2488
dbarrett@barrettlawgroup.com

Jonathan W. Cuneo
Joel Davidow
Jennifer E. Kelly
Victoria Romanenko
CUNEO GILBERT & LaDUCA, LLP
507 C Street, N.E.
Washington, DC 20002
Telephone: (202) 789-3960
jonc@cuneolaw.com
joel@cuneolaw.com
jkelly@cuneolaw.com
vicky@cuneolaw.com

Dewitt M. ("Sparky") Lovelace
Valerie L. Nettles
Lovelace and Associates, P.A.
Suite 200
12870 US Hwy 98 West
Miramar Beach, FL 32550
Telephone: (850)837-6020
dml@lovelacelaw.com
valerie@lovelacelaw.com

Gordon Ball
Law Offices of Gordon Ball
7001 Old Kent Drive
Knoxville, TN 37919
Telephone: (865)525-7028
gball@gordonball.com

Patrick W. Pendley
Pendley, Baudin & Coffin, L.L.P.
P.O. Drawer 71
Plaquemine, LA 70765
Telephone: (225) 687-6396
pwpendley@pbclawfirm.com

Shawn M. Raiter
Paul Sand
LARSON • KING, LLP
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN  55101
Telephone: (651) 312-6500
sraiter@larsonking.com
psand@larsonking.com

Lawrence J. Friscia
FRISCIA & ASSOCIATES LLC
45 Academy Street, Suite 401
Newark, NJ 07102
lawrence.friscia@friscialaw.com

*Attorneys for Plaintiffs.*